IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2004 Session

## STATE OF TENNESSEE v. CHARLES KEITH

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S44,822     Phyllis H. Miller, Judge**

**No. E2003-01721-CCA-R3-CD - Filed June 30, 2004**

The appellant, Charles Keith, was convicted by a jury in the Sullivan County Criminal Court of one count of possession of marijuana and one count of possession of drug paraphernalia. The trial court sentenced the appellant to consecutive sentences of eleven months and twenty-nine days confinement in the county jail, to be served at seventy-five percent. On appeal, the appellant challenges the trial court's denial of his motion to suppress evidence seized as a result of an investigatory stop of his vehicle. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Julie A. Rice, Knoxville, Tennessee (on appeal), and Leslie S. Hale, Blountville, Tennessee (at trial), for the appellant, Charles Keith.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and William B. Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At 12:36 a.m. on August 3, 2000, Bristol Police Officers Danny Farmer and Jason Thompson responded to a call regarding a suspicious "white vehicle" behind Marley's Molding on Industrial Drive. Marley's Molding was under construction at the time, as were many buildings in the area. Moreover, there had been several burglaries at construction sites in the area and theft of tools and other items.

At the suppression hearing, Officer Farmer testified that while Officer Thompson looked for evidence of a burglary at Marley's Molding, he drove to Modern Design, a nearby business. While investigating at Modern Design, Officer Farmer observed the brake lights of a vehicle parked near an electrical plant on the hill behind Marley's Molding. Officer Farmer drove up the one-lane gravel alley that provided access to the electrical plant. As Officer Farmer approached the vehicle, the vehicle began to back up. For safety reasons and because he did not know if the vehicle's occupants had parked on the hill behind Marley's Molding in order to break into the rear of the store, Officer Farmer turned his patrol car to approach the vehicle from the rear and not "meet it head-on." The vehicle then "backed out real quick and headed down the hill real fast." Officer Farmer observed Officer Thompson's patrol jeep turning onto the gravel alley and radioed Officer Thompson to advise him that the vehicle was coming down the hill. Officer Thompson stopped in the middle of the alley and activated the blue lights. Unable to pass, the vehicle, a white van driven by the appellant, stopped near Officer Thompson's patrol jeep.

Officer Farmer approached the van on the driver's side and asked the appellant for his driver's license. While talking with the appellant, Officer Farmer observed a "baggie" on the back seat of the van and asked the appellant to hand it to him. As the appellant handed the baggie to Officer Farmer, he claimed that the baggie did not belong to him. He said "that he'd just picked up the van." The baggie contained a green plant-like substance which "had an odor of marijuana about it." Officer Farmer asked the appellant to step from the vehicle. As the appellant got out of the vehicle, he immediately put his hand into his left pants pocket. Officer Farmer grabbed the appellant's hand and felt a marijuana pipe. Officer Farmer ordered the appellant to remove the pipe from his pocket and the appellant complied. Officer Farmer testified that the pipe also "had an odor of marijuana about it."

Officer Farmer then patted down the appellant's right pants pocket and felt another baggie. Officer Farmer said, "Why don't you pull the baggie of marijuana out of your pocket." The appellant complied, claiming that "he'd just bought it and had [driven up the hill] to smoke one before he went to work." Officer Farmer issued the appellant a misdemeanor citation and then released him.

On cross-examination, Officer Farmer stated that the City of Bristol owned the property on which the electrical plant was located and that the plant was "the only thing at the dead end of [the gravel alley]." There were "no trespassing" signs posted near the electrical plant to prevent people from entering the fenced area, but there were not any signs at the bottom of the hill. He admitted that in his experience as a police officer, he had never heard of anyone breaking into an electrical plant. Moreover, it would be dangerous for a person who was not an electrician to enter or vandalize the plant. However, Officer Farmer believed that the appellant had "[p]arked there and was at the back of Marley's Molding." He explained that the police department had previously investigated "several burglaries up there, had calls where somebody had stole[n] tools from Marley's Molding, had calls where they'd broke into TVA stuff that was moving the dirt up there, broke into their stuff, and we'd had patrol checks to be up there too . . . ." Nevertheless, Officer Farmer conceded that upon investigating Marley's Molding and Modern Design, neither he nor Officer Thompson detected any evidence of a burglary or vandalism. Officer Farmer related that approximately one month prior to

stopping the appellant, he and TVA officers had discovered persons behind a building to the left of Marley's Molding, cutting the locks off the building. However, when the officers arrived at the scene, the individuals escaped on a motorcycle.

Officer Farmer acknowledged that the description provided by the caller was a white vehicle and that the vehicle driven by the appellant was a white van. He further acknowledged that when he radioed Officer Thompson that the van was coming down the hill, he did not tell Officer Thompson to stop the vehicle. He was simply warning Officer Thompson because the gravel alley was only one-lane and he did not know whether the driver was fleeing. However, Officer Farmer conceded that he intended to stop the van to interview the driver and determine the driver's reason for being at the electrical plant. Officer Farmer stated that he also intended to complete a Field Interview Report, which is " a report that . . . shows that [the appellant] was at that location at that time and then if something [was] broke[n] into or if something happened then you're aware of who was in that area." Officer Farmer conceded that the gravel alley was only seventy-five to a hundred yards long, so the appellant was not able to build up much speed as he left the electrical plant.

Officer Jason Thompson testified at the suppression hearing that on August 3, 2000, he responded to a call regarding a suspicious white vehicle parked next to Marley's Molding on Industrial Drive. He proceeded to the Marley's Molding to investigate. He drove to the parking lot in front of Marley's Molding, but discovered no evidence of a crime. At that time, Officer Farmer radioed to advise him that he had observed a vehicle's brake lights "up next to the utility station." Officer Thompson proceeded to the electrical plant. As he turned onto the gravel alley that provided access to the plant, Officer Farmer advised him that the vehicle was driving down the hill. Officer Thompson observed a white van driving towards him and stopped his vehicle in the middle of the road. He then activated his blue lights for safety reasons and to stop the van to investigate. Officer Thompson testified that when the van stopped, Officer Farmer spoke to the driver while he went to the opposite side of the vehicle as a "cover officer."

On cross-examination, Officer Thompson conceded that when he investigated Marley's Molding, he discovered "nothing wrong." However, he maintained that it was difficult to ascertain whether anything had been disturbed because the building was under construction. Moreover, he did not walk to the rear of the building prior to Officer Farmer radioing him about the vehicle on the hill; therefore, he was unable to determine whether there had been a break-in at the rear of the building. Officer Thompson stated that no businesses in the area were open at that hour, nor were any construction workers in the area.

Based upon the foregoing testimony, the trial court denied the appellant's motion to suppress. The trial court found:

> Now, here you have buildings under construction. You have recent
> previous burglaries and thefts in the area. . . . It's half past midnight.
> There's no business open. There's no work being done. You have a
> call, a white vehicle behind Marley Molding, a suspicious white

vehicle. Officer Farmer goes . . . around Modern Design . . . and he sees tail lights . . . behind Marley Molding, they're up the hill behind Marley Molding. Now, every burglar doesn't go and park at the front door just like a regular business customer and go in a place. . . . [S]o you have [Officer Farmer] seeing th[ese] suspicious tail lights behind Marley Molding, up the hill around a power plant where it's not observable from the main road. Then [Officer Thompson] . . .goes to the front of Marley Molding, which [w]as the only access by vehicle. He doesn't see anything at the front but he doesn't get out . . . and prowl around because about that time he gets a call there's a car up there behind Marley Molding. He goes around, turns up a . . . one lane gravel road and he [observes] . . . this vehicle coming down. Now, . . . [the appellant] doesn't just drive on down in a slow manner down a gravel road, he takes out sort of abruptly, so I find that [the officers] had reasonable suspicion based on articulable facts . . . to believe that criminal activity had been or was going to be committed when they stopped [the appellant's] vehicle.

Following a jury trial, the appellant was convicted of one count of possession of marijuana and one count of possession of drug paraphernalia. Thereafter, the trial court sentenced the appellant to consecutive sentences of eleven months and twenty-nine days confinement, to be served at seventy-five percent. On appeal, the appellant challenges the trial court's denial of his motion to suppress.

## II. Analysis

On appeal, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Id. However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. The purpose of the Fourth Amendment and Article 1, section 7 is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56

S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). Consequently, "'a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting Yeargan, 958 S.W.2d at 629); Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968), holding that a law enforcement officer may conduct a brief investigatory stop if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). In determining whether an officer has a reasonable suspicion based upon specific and articulable facts, a court should consider the totality of the circumstances, including, but not limited to, "the officer's personal objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." Yeargan, 958 S.W.2d at 632; United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695 (1981). The officer "'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" Keith, 978 S.W.2d at 867 (quoting United States v. Sokolow, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 1585 (1989)).

The appellant contends that Officers Farmer and Thompson lacked a reasonable suspicion based upon specific and articulable facts to stop his vehicle. The appellant asserts that prior to stopping the van the officers did not observe him engage in any illegal activity or commit a traffic violation. The appellant further asserts that his mere presence late at night in an area where there had been several recent burglaries did not give rise to reasonable suspicion. Moreover, the appellant argues that the caller provided only a generic description of a white vehicle in the area and alluded to no illegal activity, only that the vehicle was "suspicious." Thus, the appellant contends that because the officers lacked the necessary reasonable suspicion, the trial court erred by refusing to suppress the evidence seized as a result of the illegal stop.

The appellant correctly notes that neither officer testified that they observed any illegal activity or traffic violation committed by the appellant. Moreover, this court has previously observed that a vehicle's mere presence in a high crime area late at night was not sufficient reason to stop the vehicle. See State v. Lawson, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996). However, considering the totality of the circumstances in the instant case, we conclude that the officers possessed a reasonable suspicion supported by specific and articulable facts to stop the van driven by the appellant.

Shortly after 12:30 a.m., Officers Farmer and Thompson responded to a call regarding a suspicious white vehicle behind Marley's Molding, a building that was under construction. The

building was located in an area that had recently experienced several burglaries and thefts at construction sites, including Marley's Molding. The officers testified that no businesses in the area were open at that time of night. Officer Thompson investigated Marley's Molding, while Officer Farmer drove to Modern Design, a nearby business. Although neither officer discovered evidence of a burglary, Officer Thompson testified that the rear of Marley's Molding was inaccessible by vehicle and before he was able to walk to the rear of the business, Officer Farmer radioed him regarding a vehicle on the hill behind Marley's Molding.

As Officer Farmer circled Modern Design, he observed the brake lights of a vehicle parked by an electrical plant on the hill behind Marley's Molding. Officer Farmer testified at the suppression hearing that the property on which the electrical plant was located was owned by the city. He further stated that the gravel alley behind Marley's Molding provided the only access to the plant and the plant was "the only thing at the dead end of [the gravel alley]." Although Officer Farmer conceded that he had never heard of anyone breaking into an electrical plant, he believed that the appellant had parked there in order to access the rear of Marley's Molding. As Officer Farmer drove up the gravel alley toward the electrical plant to investigate, the vehicle, a white van, "backed out real quick and headed down the hill real fast." Officer Farmer radioed Officer Thompson, who had already turned onto the gravel alley. Officer Thompson activated his blue lights and stopped the van. Considering the totality of the circumstances, we conclude that the officers possessed a reasonable suspicion to stop the van driven by the appellant. See State v. Scarlett, 880 S.W.2d 707 (Tenn. Crim. App. 1993). Accordingly, the trial court committed no error by denying the appellant's motion to suppress.

### III. Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-6-